## BLAKENEY ET AL. VS. FERGUSON ET AL.

A widow is not entitled to dower in the lands of her husband, under the territorial law, unless he was seized and possessed during coverture, either by virtue of a deed, patent, entry, warrant or survey; nor, under the common law, in lands to which the husband had only an equitable title.

Under the Territorial Statute of Limitations the legal title to land did not vest in the party in possession, who had not paid the taxes on the land for the full period of limitation, as well as held uninterrupted possession of the land for the same time.

Where a father puts one of his children in possession of land, and he holds it as the tenant of his father and by his permission, his subsequent possession after the death of his father, must be regarded as having been for the benefit of himself and his co-heirs, as joint owners, unless it is proven that he held adversely; and the stat-

ute of limitations will not commence running in his favor as against them, until he does some act amounting to an ouster or disseizin of his co-tenants.

Where a son is put in possession of land by his father, he and those claiming under him are estopped to deny the title of the father.

*Appeal from Prairie Circuit Court in Chancery.*

Hon. John J. Clendenin, Circuit Judge.

S. H. Hempstead, for appellants.

It can admit of no question, that the complainants are obliged to trace their title, if they have any, up to the original proprietor, the United States, or to stop short of that by resting on a tax title; which is a separate and independent title; a new right, in no way connected with previous claims or rights. *Blackwell on Tax Titles*, 631. This being the case, it must appear that the tax sale was made in accordance with law. It is not a matter of defence, but a matter of averment, and must appear as of the very essence of the right. *And it must be proved.*

In that view, the present bill is fatally defective. It does not show that the requisites of the law, respecting tax sales, had been complied with; and, consequently, on the face of the bill it appears that the tax sale was void.

Joseph Ferguson, the father of Moses Ferguson, acquired no title to the land by virtue of possession. There was then no statute of limitation giving such right, and no other rule could obtain than that existing at the common law, which established twenty years uninterrupted possession as the period required to give title. 3 *Bl. Com.* 196; 4 *Co.* 11 *b.*, 1 *Greenl. Ev.*, 17.

The territorial seven year statute cannot help Joseph Ferguson, the ancestor, because *first*, the bill itself shows that from and after 1831, Moses, and not Joseph Ferguson, was in actual possession, and *second*, because it does not appear that the latter paid taxes on the land for *seven* consecutive years. These were necessary before that statute could be made available. *Ter. Dig.*, 382.

The proof shows that Joseph Ferguson paid taxes on the land for five years, that is from 1829 to 1833 inclusive. And also, that from 1834 to 1845, both inclusive, a period of eleven years, the tract of land was assessed to and the taxes paid by Moses Ferguson, who was really by possession and limitation the owner of the land when it was sold to Blakeney as his property.

Joseph Ferguson then at the time of his death, in 1836, had no title to the tract of land in controversy by possession; and the tax title being void, the land did not descend to his heirs, and the only title there was remained in Moses Ferguson. Whether good or bad is not material; for the complainants must recover, if at all, on the strength of their title.

If the complainants ever had any title, which we deny, they are by their own conduct and acquiescence in the claim of Moses Ferguson estopped from setting it up, or having any relief whatever. For even if it was true that they were co-tenants, (which we have shown to be absurd,) still the acts of Moses Ferguson amounted to a disseizin of his fellows and co-tenants.

Thus possession by one co-tenant, and reception of rents and profits to his own use, without accounting to the other is a disseizin. (1 *East R.*, 568; *Angell on Lim.*, 461, 467.) A disseizin may be shown by words or acts. Thus, where one takes the profits exclusively and continuously for a long period, under circumstances which indicate a denial of a right in any other to receive them, as by not accounting, with the acquiescence of the other tenants; an ouster may be presumed. *Frederick vs. Gray*, 10 *Serg. & R.*, 182; *Angell*, 466. 467.

And so a claim of the whole premises *with an offer to sell the same* amounts to a disseizin. *Valentine vs. Northrop*, 12 *Wend.*, 494; *Angell*, 466.

It is fatal to the dower claim that Joseph Ferguson did not die seized and possessed of the tract of land in controversy; which was necessary under the then law to entitle the widow to be endowed. *Ter. Dig.* 210; *Crittenden vs. Johnson*, 14 *Ark.*

550          CASES IN THE SUPREME COURT

Blakeney et al. vs. Ferguson et al.          [October

447. The legal title or seizin was not in Joseph Ferguson; he had nothing but an *equitable title* in any event; and of that the widow could not be endowed. It was only of the legal estate under that law that she could be endowed.

JORDAN, for the appellees:

Even if Joseph Ferguson had not acquired a good equitable title against the former owner of the land, or Sampson Gray's widow and heirs, it does not lie in the mouths of appellants, claiming through Moses, to set up any such defence—they are estopped from so doing.

There is not a scintilla of evidence in this record, even conducing to show that Moses Ferguson ever had or held any other right, title, claim, or interest in said land, either by possession or otherwise, than that which his father acquired by virtue of the tax sale and his purchase from Sampson Gray. *Hurle vs. McCoy*, 7 *J. J. Marshal*, 318; *Milton vs. Riley*, 1 *Dana* 359; *Jackson vs. Hinman*, 10 *J. R.* 293, 223, 12 *J. R.* 201; *Miller et al. vs. Shackleford*, 4 *Dana* 285; *Wall vs. Hill's heirs*, 1 *B. Monroe*, 291; *Drane vs. Gregory's heirs*, 3 *B. Monroe*, 619; *McClain vs. Gregg*, 2 *Marshall*, 456, 6 *J. J. Marsh.* 606; 2 *A. K. Marsh.* 454; *Lyne vs. Bank of Ky.*, 5 *J. J. Marsh.* 564; 570; *Riddle vs. Murphy*, 7 *S. & R.* 230.

The testimony clearly shows that Joseph Ferguson put his son, Moses, into possession of the land—that at the death of his father, he had only been in possession about four years. That he had then acquired no title by length of possession, by any limitation then or since known to the law, is too clear to require argument. Had he acquired a title in any other manner? If so, there is not a scintilla of evidence to prove it. There is not even a verbal gift, or a deed of gift, or other conveyance in writing.

The period of limitations had not elapsed at the time of the institution of the first suit in this case; but if it had, the possession of Moses was not *adverse* to that of his mother and broth-

OF THE STATE OF ARKANSAS. 551

TERM, 1859.] Blakeney et al. vs. Ferguson et al.

ers and sisters, but in *trust*, and in such case the statute does not run.

In order to constitute an *adverse* possession there must be an entry upon the land under *color* and *claim* of title by deed, conveyance, or other writing, though it is not really necessary that such deed be valid and unexceptionable. Continued, visible, open and notorious possession under a void deed is evidence of adverse possession.

In *Humbert vs. Trinity Church*, 24 *Wend*. 537, COWEN J. said that a naked possession, not accompanied with any claim of right, will never constitute a bar, but will enure to the advantage of the real owner, being a possession in *his right*, and for his benefit; that the law presumes till the contrary be shown that a man in possession, *without title*, intends to hold for the true owner; in other words, that he intends to hold *honestly* as far as he can consistently with holding at all. *Lund vs. Parker*, 3 *N. H.* 49; *Ewing vs. Burnette*, 11 *Pet.* 41; *Jackson vs. Thomas*, 10 *J. R. Rep.* 293; *Warren vs. Childs*, 11 *Mass.* 225; *Kehoboth vs. Carpenter*, 23 *Pick.* 137; *Little vs. Magguier*, 2 *Greenl.* 177, 225; *Jackson vs. Woodruff*, 1 *Cow.* 286; *Jackson vs. Otts*, 8 *Wend.* 441; *La Frombois vs. Jackson*, 8 *Cow.* 596; *Taylor's devisees vs. Burnsides*, 1 *Grattan*, 166; *Northrop vs. Wright*, 7 *Hill*, 488.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

The subject of controversy in this suit (the south-west quarter of section 17, township 4 north, range 9 west,) has been in litigation, in one form and another, between the parties, and the ancestors of some of them, since the year 1845, and has heretofore been several times before this Court. See *Blakeney vs. Ferguson et al.*, 14 *Ark.* 641, where the character and history of the previous litigation are fully stated. After the dismissal of that case, without prejudice, in obedience to the mandate of this Court, Mary Ferguson, the widow, and the heirs at law of *Joseph Ferguson*, filed the present bill in the Prairie Circuit Court, against the heirs of *Benjamin Blakeney*,

552          CASES IN THE SUPREME COURT

Blakeney et al. vs. Ferguson et al.          [October]

and the widow and her present husband (Hamilton Reynolds), and the heirs at law of *Sampson Gray*, deceased.

The objects of the bill were to obtain dower in the land above described for Mary Ferguson, and partition of the remainder between the other complainants, as heirs at law of *Benj. Blakeney*, and to establish title, etc., as against the widow, etc., and heirs of *Sampson Gray*.

The representatives of *Sampson Gray* filed an answer, disclaiming title to the land. The cause was heard upon the pleadings and evidence between the other parties, a decree in favor of the complainants in accordance with the prayer of the bill, and an appeal by Blakeney's heirs.

It was satisfactorily proved upon the hearing, that the appellees were the widow and heirs at law of *Joseph Ferguson*, under whom they claimed the land in question, and for want of which proof they were defeated in a previous suit (*see case in* 14 *Ark.* 641).

It appears that Joseph Ferguson, by a verbal contract, purchased the land of Sampson Gray, obtained possession of, and made valuable improvements upon it, under and by virtue of the contract. This was sufficient part performance to take the contract out of the statute of frauds, and to entitle the appellees to a decree against the widow and heirs of Gray, if they had not disclaimed—as held in *Blakeney vs. Ferguson et al.*, 3 *Eng. R.* 272.

It remains but to determine: 1st, whether Mrs. Ferguson was properly decreed dower in the land; and, 2d, whether partition of the land was correctly decreed, as between the other appellees and the appellants.

1. The case made for Mrs. Ferguson, by the bill, is, that *Sampson Gray* purchased the land at tax sale, on the 5th of November, 1827, and obtained the collector's certificate of purchase. That sometime in the year 1828, Gray sold the land to Joseph Ferguson, the husband of Mrs. Ferguson, transferred the certificate of purchase to him, by delivery, and agreed that

the collector should execute to him the tax deed upon the expiration of the time allowed by law to the former owner of the land to redeem. But the deed was never executed on account of the neglect, etc., of the parties. That at the time said *Joseph* purchased the land of Gray, he took possession of it, afterwards made improvements upon it, and that he, and his son Moses, as his tenant, held possession thereof until he departed this life in April, 1836. The proof read upon the hearing conduces to establish the truth of these allegations.

The dower statute in force at the time Joseph Ferguson died, provides that: "If the intestate leaves a widow, and lawful issue, the widow shall be entitled, as her dower, to one-third part of such lands and tenements of which the husband was seized and possessed during coverture, either by virtue of a *deed, patent, entry, warrant or survey*, and to which she has not relinquished her right of dower, except lands sold on execution, or where lands have been mortgaged and sold in pursuance of a decree of a court of justice."

The bill affirmatively shows, upon its face, that Joseph Ferguson was not, at any time before his death, seized and possessed of the land in question by virtue of any of the modes of acquiring title named in the statute.

Nor does the common law afford his widow any support in her claim to dower; for, by it, the husband must have a legal title to the land to entitle the wife to dower. She has no dower in an estate to which the husband has but an equitable title, as in the case now before us. 1 *Cruise* 182; *Crabb vs. Pratt & Wife*, 15 *Ala.* 847; *Davenport vs. Farrar*, 1 *Scam.* 315; *Hopkins vs. Frey*, 2 *Gill* 364.

But it is insisted, by the solicitor of Mrs. Ferguson, that her husband acquired legal title to the land by lapse of time, under the Territorial statute of limitations.

That statute declares that: " it shall not be lawful for any claimant to bring or maintain suit for the recovery of land; *Provided*, said claimant shall have been out of possession of the land sued for seven years, against any person or persons,

35

who 'may have enjoyed, for seven years, the uninterrupted possession of said land; and, *provided also*, that said defendant shall have paid the taxes on said land during the period aforesaid; saving, however, the right of infants," etc.  *Steel & Mc-Camp. Dig.*, *p*. 382.

Passing over the question whether this was not merely a statute of limitations, and not of title, uninterrupted possession of the land for seven years, and the payment of the taxes charged upon it during that period, were both necessary to entitle *Joseph Ferguson* to the benefit of the statute.  *Irving vs. Brownwell*, 11 *Ill. R.* 402.

There is no satisfactory evidence in the record that Joseph Ferguson was in possession of the land for seven years previous to his death.  The proof shows that he and his son went upon the land, and commenced making improvements, in the winter of 1832.  There is no proof that he was in possession of the land prior to that time.  He died in April, 1836, less than seven years after his possession is shown to have commenced.

The bill does not allege that he paid any taxes upon the land at all, and, in the answer of appellants, there is a demurrer to the bill for want of equity.  If a material matter, not alleged, could be proven, the evidence fails to prove that Joseph Ferguson paid the taxes upon the land, for the seven years preceding his death.

It appears that the land was assessed to him for the years 1829, 1830, 1831, 1832 and 1833.  The collector's receipts to him for his Territorial and county taxes for the last four years referred to, were produced upon the hearing, but no receipt or other evidence of payment for the year 1829.  For the year 1834, it seems that the land was assessed to his son *Moses*, but there was no proof that the taxes were paid by any one.  It does not appear that the land was assessed to any person for the year, 1835.  The receipt of the collector to Joseph Ferguson for his taxes for that year was produced, but there is no land or other property described in it.

Joseph Ferguson having no legal title to the land in question, at the time of his death, but an equitable title only, in which his wife was not entitled to dower, if his heirs at law have, since his death, by lapse of time or otherwise, acquired a perfect legal title, this does not enure to her benefit in her claim to dower.

It follows that so much of the decree of the Court below as gave her dower in the land was erroneous.

2. It is next to be determined whether the Court below correctly decreed partition of the land between the heirs of *Joseph Ferguson* and the heirs of *Benjamin Blakeney*.

The interest of *Moses Ferguson* (one of the sons of Joseph) in the land was sold by the sheriff of Pulaski county, under an execution against *Moses*, in April, 1845, and purchased by *Benj. Blakeney*, under whom appellants claim. Proclamation was made at the sale, by Alfred H. Ferguson, and his brother *Moses*, in the presence and hearing of Benjamin Blakeney, that Moses had no interest in the land other than as joint owner with his five brothers and sisters. Whereupon Blakeney remarked that he would risk all their titles if he bought it as the property of Moses. Shortly after this sale, commenced the litigation between the parties, which has been kept up until the present time, Blakeney attempting to obtain and hold possession of the whole of the land under his purchase, and the widow and heirs of Joseph Ferguson endeavoring to injoin him, and to procure dower therein for the widow, and partition of the remainder between the other litigants, conceding the right of Blakeney to the interest of *Moses*, as tenant in common.

It is not pretended in the answer of the heirs of Blakeney (the appellants), that *Moses Ferguson* ever purchased the land from any one, or obtained a paper title to it from any source; but they allege that at the time their father purchased the land under execution, Moses had acquired a right to hold it by adverse possession and lapse of time.

The substance of the proof, as to the possession of *Moses*, is as follows:

Drury Dobbins deposed that he was the neighbor of Joseph Ferguson and his family, from the year 1830 to the year 1840. During the former year, Moses was single, and lived with his father, who, it seems, resided on a tract of land (160 acres) near the land in question. In 1831, Moses got married, but continued for a while after to live with his father. In the winter of 1832, his father, *Moses*, and his brothers, laboring together, commenced to improve the land in controversy. They built upon it a house, two stables, a crib, cleared and put in cultivation twelve acres, and Moses lived in the house. *Joseph Ferguson* seemed to control the place, and he and his sons worked together on both places. About a year or so before he died, he and Moses, and his other sons, built a horse-mill on the land in dispute, which was used by the family in common, before and after the death of said Joseph. *Moses* lived on the land from the time the house referred to above was built upon it until the death of his father, and afterwards, etc., but his father claimed to be the owner of the land to the time of his death. Shortly after the cabin was built upon the land, and while Moses was living in it, witness had a conversation with *Joseph Ferguson* in which he asked him if he designed giving the place to Moses. His answer was: It is my intention for Moses to have and use the place as a home, but I shall make him no title until I find myself able to settle the balance of my children as well.

At the time of his death he had seven children, claimed the land in question, the other tract above referred to, had a good deal of stock, and was a tolerably good liver.

Other witnesses deposed that he claimed to own the land in question, and another 160 acre tract, at the time of his death, and that his stock was worth from $300 to $400, and his household property about $150. He had no other property.

No witness testified that Moses Ferguson ever set up any

claim to the land before the death of his father, and it is manifest, from the evidence, that he went into the possession of it as the tenant of his father, and continued there by his permission. It is probable that the old man intended to give him the land, if, in after years, he found himself able to make gifts of equal value to his other children, but he died before he acquired the means of doing so, and there is no proof that he ever made Moses any title to the land, or gave it to him verbally. It is true that it appears that the land was assessed to him for the year 1834, but there is no evidence that he paid the taxes, nor is it shown that his father had any knowledge that the land was assessed in his name.

We think that the appellants failed to produce any evidence that the possession of Moses, from the time he went upon the land, to the death of his father, in April, 1836, was adverse, or that the statute of limitation had commenced to run in favor of Moses and against his father.

Moses being in possession of the land when his father died, as his tenant, his subsequent possession must be regarded as having been for the benefit of himself and his brothers and sisters, as joint owners, unless it is proved that he held ad. versely.

The possession of one joint tenant, tenant in common, or co-parcener is the possession of another, and until the tenant in possession does acts amounting to an ouster, or disseizin of his co-tenant, the statute of limitation does not begin to run in his favor. *Angel on Lim.* 456–7–8.

Where one tenant enters as sole owner, and his possession is openly and notoriously adverse to his co-tenants, it amounts to a disseizin. *Ib.*

An ouster or disseizin is not to be presumed from the mere fact of sole possession; but it may be proved by such possession accompanied with a notorious claim of exclusive right. To make a possession of one tenant in common adverse against the other, it is not necessary that notice should be given of the adverse intent, but the intent must be manifested by outward

acts of an unequivocal kind.  *Ib.*  See, also, *Ashley et al. vs. Rector, ante.*          .

· These are some of the familiar general general rules on the subject of limitation, as between tenants in common, etc.

It appears from the evidence that Moses Ferguson continued to live on the land in question, after the death of his father, until January, 1838, when he moved to another place, and remained there until the spring of 1843; and then he moved back on to the land in dispute, and continued to reside there until Blakeney purchased it at execution sale in April, 1845.

Witness, *Dobbins,* resided on the land after Moses left it, in 1838, until November, 1840.  He paid no rent to any person. He was to go on the place and keep it up for the use of it, which he did, and made same little improvement.  While he occupied the place, Mary Ferguson and her family, and *Moses* and witness, purchased a team to run the mill, which Joseph Ferguson and his sons built upon the land during his lifetime. Witness attended to keeping the mill, and paid the tolls to the family in common, viz: he retained one-half for his services, and paid the remainder to Mrs. Ferguson, Moses, and his brothers and sisters in common.

Moses put witness in possession of the place when he left it, in 1838, but never heard of his claiming the land as his own.

*Wm. Robbins* deposed, that he rented the land of Moses in 1843, and paid the rent to him.  Moses offered to sell him the land several times during the year, claiming it as his own. When paid the rent corn, Moses and his brother, Alfred H., hauled it away—none of the appellees were present when witness rented the land of Moses, nor when he offered to sell it to him.

*Joel Evans* deposed, that in the fall of 1844 he went to Moses, with one Jones, who wanted to buy the land, and Moses offered to sell it to him, claiming it as his own.  None of the appellees were present.

It appears from the abstract from the tax book in the Auditor's office, that the land in dispute was assessed in the name

of *Moses*, for the years 1838-9-40-42-3-4, but there is no evidence that he paid the taxes for any year.

It does not appear that there was any administration upon the estate of Joseph Ferguson.

The above is the substance of all of the evidence introduced by the parties in relation to the possession of the land, etc.

It is manifest that Moses did not acquire the right to hold the land against his brothers and sisters, under the Territorial act of limitation above copied; because, to say nothing of the fact that there is no evidence that he paid any taxes upon the land, we have seen that he held as tenant of his father to the time of his death, in April, 1836, and from that time to the repeal of the act, (20*th March*, 1839. *Rev. Stat., chap.* 129, *sec.* 25,) there is no evidence that Moses asserted any exclusive claim to the land, or did any open and notorious act hostile to the title of his co-tenants.

The ten years act of limitation contained in the *Revised Statutes*, went into operation by proclamation of the Governor 20th March, 1839.

On the 28th August, 1845, and before the expiration of the ten years from the time that act took effect, the appellees filed their first bill against James Blakeney and others, which was finally dismissed without prejudice, under the mandate of this Court, as above noticed, and the present bill filed within one year from that time.

Moreover, there is no evidence that Moses openly asserted any claim to the land adversely to the title of his co-tenants, until the year 1843, when he offered to sell it to Robbins, claiming it as his own.

The assessment of the land for taxes in his name was, of itself, under the circumstances, no evidence of adverse claim. He being the oldest son, and there being no administrator upon the estate of his father, it was natural that he should see to the payment of taxes upon the land for the family.

The fact that the mill situated upon the land, from the time it was built down to the year 1840, (which is as late as the wit-

nesses speak of it,) was used by, and employed for the benefit of the family in common, is an item of proof, of some weight, that Moses did not, during that period, assert an exclusive right to the land, etc.

It is insisted for the appellants, that the bill and evidence fail to show a regular sale of the land for taxes, to Sampson Gray, in 1827, and that, consequently, *Joseph Ferguson* derived no title to the land through him.

It is sufficient to say, in response to this, that Moses Ferguson having gone into possession of the land as the tenant of his father, he, and the appellants claiming under him, are estopped by a familiar general rule to deny his title. *Burke vs. Hale*, 4 *Eng. R.* 329; *Bettison vs. Budd*, 17 *Ark.* 546. There is no showing that Moses ever entered, or held possession of the land under any other title than that of his father.

So much of the decree of the Court below as awards dower to Mrs. Ferguson must be reversed, and the bill dismissed as to her for want of equity. The decree must be further reformed so as to make partition of the whole of the land between the other appellees and the appellants, giving to the latter one-sixth part, that being the interest of Moses Ferguson. So much of the decree as directs the master to take an account of rents and profits, and appoints commissioners to make partition of the land will remain unchanged.

The proper decree must be entered here, and certified to the Court below to be executed.

The costs of this Court must be equally divided between the appellants and the appellees.